UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CATHERINE JONES, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 21-1952 (RBW) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

The plaintiff, Catherine Jones, brings this civil action against the defendant, the Washington Metropolitan Area Transit Authority ("WMATA"), asserting claims of discrimination and hostile work environment based on her race, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII"), see Plaintiff's Complaint for Damages and Equitable Relief ("Compl.") ¶¶ 85–133, ECF No. 1. Currently pending before the Court is the Defendant's Motion for Summary Judgment ("Def.'s Mot." or the "defendant's motion"), ECF No. 24. Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must grant the defendant's motion.

**I.   BACKGROUND**

**A.   Factual Background**

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."), ECF No. 24-1; (2) the Defendant's Statement of Material Facts Not in Dispute ("Def.'s Facts"), ECF No. 24-2; (3) the Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"), ECF No. 25; (4) the Plaintiff's Statement of Material Facts in Dispute ("Pl.'s Facts"), ECF No. 25; and (5) the Reply in Support of Defendant's Motion for Summary Judgment ("Def.'s Reply"), ECF No. 26.

The plaintiff, Catherine Jones, "currently works for WMATA and has since 2006." Def.'s Facts ¶ 1; Pl.'s Facts ¶ 1.  In 2020, "Grievances GMS2020-464 (Unsatisfactory Performance Evaluation) and GMS2020-465 (Bullying by Manager) were filed on behalf of [the plaintiff]."  Def.'s Facts ¶ 5; Pl.'s Facts ¶ 5.  With respect to her first grievance—namely, the Unsatisfactory Performance Evaluation grievance—the plaintiff, through her union, alleged that "[f]or the past three consecutive years, [m]anagement [at WMATA] improperly implemented [her] [p]erformance [p]lan with no beginning [of] year one on one, mid-year review, or end of year review that resulted in an unsatisfactory performance period."  Def.'s Mot., Exhibit ("Ex.") 6 (Unsatisfactory Performance Evaluation Memorandum (Dec. 14, 2020) ("Unsatisfactory Performance Evaluation Grievance")) at 1, ECF No. 24-4.  Furthermore, the plaintiff claimed that the "performance plan's objectives [were] subjective and unattainable with unrealistic timelines [that were] more in line with consultant activities."  Id., Ex. 6 (Unsatisfactory Performance Evaluation Grievance) at 1.  Finally, she alleged that "[m]anagement ha[d] consistently implemented [her] Performance Plan improperly and late, which placed [her] at a disadvantage with performing objectives."  Id., Ex. 6 (Unsatisfactory Performance Evaluation Grievance) at 1.  The plaintiff's requested relief for her first grievance included (1) "rescind[ing] [her] Unsatisfactory Performance Rating and replac[ing] it with a Satisfactory Performance Year[,] with an eligible step increase[,] and retro[active] pay from her anniversary date," and (2) "reassign[ing] [her] to another manager or department."  Id., Ex. 6 (Unsatisfactory Performance Evaluation Grievance) at 2.

With respect to her second grievance—namely, the Bullying by Manager grievance—the plaintiff claimed that her manager, "Mr. [Steven] Segerlin[,] ha[d] continuously engaged in deliberate negative behavior and bullying of [the plaintiff], in a fashion that resulted in harm to

2

her health, thereby establishing a hostile work environment." Id., Ex. 7 (Bullying by Manager Memorandum (Aug. 17, 2021) ("Bullying by Manager Grievance")) at 1, ECF No. 24-4.  More specifically, the plaintiff alleged a "[p]ersistent [p]attern of [t]hreats and [h]arassment," the "[r]emoval of [c]ore [j]ob [d]uties," "[s]abotaging [w]ork [p]roductivity," "[d]emeaning [c]omments," "[e]xclusion from [e]ssential [m]eetings/[p]rojects," "[e]xcessive [m]onitoring/[r]eprimanding [p]ublicly," and the setting of "[u]nrealistic [s]tandards."  Id., Ex. 7 (Bullying by Manager Grievance) at 1–3.  In support of these allegations, the plaintiff claimed, inter alia, that "Mr. Segerlin ha[d] threatened [her] to find another job[,]" id., Ex. 7, (Bullying by Manager Grievance) at 1, and "[o]n one occasion, Mr. Segerlin's response to [her] request [for assistance] was 'I am the Task Master and you are the Doer[,]'" id., Ex. 7 (Bullying by Manager Grievance) at 2.  The plaintiff's requested relief for this grievance included (1) "[d]ismissal of Mr. [ ] Segerlin from [the plaintiff's] chain of command," id., Ex. 7 (Bullying by Manager Grievance) at 3, and (2) "compensat[ing] the plaintiff in the amount of $35,000 for pain and suffering since Mr. Segerlin's appointment to the Office of [Land and Real-estate] in 2018[,]" id., Ex. 7 (Bullying by Manager Grievance) at 3–4.

   Subsequently, on July 19, 2021, the "[p]laintiff filed a three[-]count complaint alleging race based discrimination (hostile work environment and disparate treatment) and retaliation in violation of Title VII[.]"  Def.'s Facts ¶ 2; Pl.'s Facts ¶ 2.  More specifically, the plaintiff alleged that she "endured management['s] unnecessary supervisory scrutiny of her attendance, verbal harassment and derogatory comments, [the] undermin[ing] of her role by refusing to recognize her leadership role, remov[al of] significant job responsibilities," receiving "unfair performance evaluations, and [management] subject[ing] her to unfair discipline."  Compl. ¶ 87; see also id. ¶ 101.  The plaintiff's requested relief included (1) "compensatory damages in a fair and just

amount," (2) "[d]amages and equitable relief for all harm [the p]laintiff has sustained as a result of [the d]efendant's unlawful conduct including for loss of promotional potential, reputation, lost wages, [and] lost job benefits she would have received but for [the d]efendant's unlawful conduct," and (3) "any medical costs and expenses incurred as a result of [the d]efendant's unlawful conduct."  Id. at 19.

"On or about December 2, 2021, WMATA and the Office and Professional Employees International Union Local 2 ('Local 2') on behalf of [the plaintiff] entered into a [s]ettlement [a]greement."  Def.'s Facts ¶ 3; Pl.'s Facts ¶ 3.  The settlement agreement states, in relevant part:

> This letter is written to document a [s]ettlement [a]greement entered into by the parties **to address the issues raised in the Local 2 grievances, GMS2020-464 (Untimely Performance Evaluation)**[2] **and GMS2020-465, (Bullying by her Manager)** on behalf of Senior Transit Planner, Facilities, Catherine Jones ID# 007741, **regarding her concern about her being unfairly treated by her current management.**  The parties (WMATA and Local 2) on behalf of Ms. Jones, in the spirit of continuing the good labor relations relationship, and without [Land and Real-estate] management acknowledging any wrongful conduct, have agreed to resolve these grievances in the following manner . . .
>
> **The parties agree that this agreement satisfies all claims of the grievances GMS2020-464 and GMS2020-465 raised by the Union on behalf of Ms. Catherine Jones**' ID#007741 and does not set any precedent for any other grievance for any other employee.

Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4.  Also, "[i]n December 2021, WMATA permitted [the p]laintiff to transfer jobs, and Mr. Segerlin no longer served as her manager."  Def.'s Facts ¶ 21; Pl.'s Facts ¶ 21.

---

[2] There appears to be a typographical error in the settlement agreement.  The settlement agreement labels grievance GMS2020-464 as "Untimely Performance Evaluation[.]"  Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4.  However, as both parties agree in their Statements of Material Facts Not in Dispute, the appropriate label for "Grievance[] GMS2020-464" is "Unsatisfactory Performance Evaluation[.]"  Def.'s Facts ¶ 5; Pl.'s Facts ¶ 5.  Ultimately, this error is immaterial to the resolution of this matter, as it is apparent the settlement agreement is referring to the same grievance—i.e., GMS2020-464.

B.  **Procedural Background**

The plaintiff filed her Complaint in this case on July 19, 2021.  See Compl. at 1.  In response, on January 27, 2023, the defendant filed its motion for summary judgment.  See Def.'s Mot. at 1.  The plaintiff filed her opposition on February 28, 2023, see Pl.'s Opp'n at 1, and the defendant filed its reply in support of its motion on March 15, 2023, see Def.'s Reply at 1.

## II.  STANDARD OF REVIEW

A court may grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."  Anderson, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment[.]"  Id.  The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Accordingly, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial."  Anderson, 477 U.S. at 248 (internal quotation marks omitted).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position . . . [is] insufficient" to withstand a motion for summary judgment; rather, "there must be [some] evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

### III.   ANALYSIS

The defendant argues that it is entitled to summary judgment on both the plaintiff's race discrimination and retaliation claims.  See Def.'s Mem. at 1.  Specifically, the defendant argues that "[i]n early December 2021, [the p]laintiff settled 'all claims' raised in her grievances, when she agreed to take on a new role at WMATA, transfer out of her prior department, and work under different supervisors."  Id.  Accordingly, the defendant alleges that the "plain language of the settlement agreement unambiguously released all claims and bars [the plaintiff's] lawsuit."  Id.  Furthermore, the defendant asserts that "[e]ven if the Court disagrees that the release encompasses the same acts of misconduct advanced in both the union grievances and [the p]laintiff's Complaint, [the p]laintiff's Title VII claims fail as a matter of law."  Id.  In response, the plaintiff claims that "the [d]efendant's [m]otion for [s]ummary [j]udgment should be denied . . . since there are material facts in dispute and a reasonable fact finder could determine that [the d]efendant was liable for its unlawful conduct in violation of Title VII."  Pl.'s Opp'n at 4.  As a threshold matter, the Court must first address whether the plaintiff's claims are barred by the settlement agreement.  Because the Court ultimately concludes that the plaintiff's claims are barred by the settlement agreement, the Court need not address the merits of the plaintiff's Title VII claims.  See REA Express, Inc. v. Travelers Ins. Co., 406 F. Supp. 1389, 1391 (D.D.C. 1976)

(holding that in resolving the parties' motions for summary judgment "[t]he Court need not reach the merits of [other] issues . . . since one threshold issue" was "dispositive of [the plaintiff's] complaint").

### A.     Whether the Plaintiff's Claims are Barred by the Settlement Agreement

The defendant argues as a preliminary matter that "[t]he clear language of the [s]ettlement [a]greement entered into almost six months after the filing of [the plaintiff's] Complaint, shows that on or about December 2, 2021, [the p]laintiff released the claims advanced in her Complaint in exchange for accepting a new job at WMATA under different supervisors." Def.'s Mem. at 5–6. Accordingly, the defendant requests that the Court "grant summary judgment for WMATA and dismiss [the p]laintiff's claims with prejudice." Id. at 6. The plaintiff does not meaningfully respond to the defendant's argument.[3]

"When assessing whether a plaintiff has waived [her] right to bring a particular claim by signing a release, the normal rules of contract interpretation apply." Keister v. AARP Benefits Comm., 410 F. Supp. 3d 244, 250 (D.D.C. 2019), aff'd, 839 F. App'x 559 (D.C. Cir. 2021). "Under District of Columbia law, if the language of a release is not ambiguous on its face, the Court 'must rely solely upon its language as providing the best objective manifestation of the parties' intent.'" Fed. Deposit Ins. Co. v. Parvizian, Inc., 944 F. Supp. 1, 3 (D.D.C. 1996) (quoting Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc., 475 A.2d 382, 385 (D.C.C.A. 1984)). Additionally, "a release containing language discharging 'any and all claims' is unambiguous and constitutes a general release that should not be construed narrowly." Keister,

---

[3] In the Introduction section of her opposition to the defendant's motion for summary judgment, the plaintiff acknowledges the defendant's argument and states that she will address it later in her brief. See Pl.'s Opp'n at 3 ("[The defendant] argues that, because [the plaintiff] settled these two [grievances], she waived her right to be heard on any claim arising from a similar fact pattern. For reasons [the plaintiff] will describe below, [the defendant's] reading of the settlement agreement is erroneous."). However, there is no further reference to the defendant's argument, let alone any response to it, in the plaintiff's opposition. See generally id.

7

410 F. Supp. 3d at 252 (alteration in original) (quoting Parvizian, 944 F. Supp. at 3); see also Hershon v. Gibraltar Bldg. & Loan Ass'n, Inc., 864 F.2d 848, 852 (D.C. Cir. 1989) (noting that an agreement providing for the release of "any and all [c]laims" is clear and unambiguous). "In addition, a release—as a form of contract—is not rendered ambiguous by the mere fact that the parties thereto do not agree upon the proper construction of its terms." Parvizian, 944 F. Supp. at 3.

"Moreover, and significantly, '[t]he mere fact that an agreement providing for a general release is silent with respect to certain matters in dispute at the time the release was executed "does not mean that obligations and documents not expressly mentioned or integrated were not released."'" Keister, 410 F. Supp. 3d at 252 (alteration in original) (quoting Parvizian, 944 F. Supp. at 4). Indeed, "[a]s the D.C. Circuit declared in Sanders [v. Washington Metropolitan Area Transit Authority, 819 F.2d 1151, 1157–58 (D.C. Cir. 1987)], settlement agreements . . . 'support preclusion' of additional claims by parties to the settlement." Chester v. Washington Metro. Area Transit Auth., 335 F. Supp. 2d 57, 62 (D.D.C. 2004); see Sanders, 819 F.2d at 1156 (holding that "[o]n the issue of negligent termination, [the plaintiffs were] estopped from litigation by the doctrines of claim preclusion (res judicata) and issue preclusion (collateral estoppel) because the issue of negligent termination was either raised or should been raised in the grievance process, and therefore [could not] be pressed again"). As such, "[u]nder this rationale, [a] plaintiff is barred from bringing [her] previously settled claim again." Chester, 335 F. Supp. 2d at 62.

> Here, as noted earlier, the relevant settlement agreement provides:
>
> This letter is written to document a [s]ettlement [a]greement entered into by the parties **to address the issues raised in the Local 2 grievances, GMS2020-464 (Untimely Performance Evaluation) and GMS2020-465, (Bullying by her Manager)** on behalf of Senior Transit Planner, Facilities, Catherine Jones ID#

> 007741, **regarding her concern about her being unfairly treated by her current management.**  The parties (WMATA and Local 2) on behalf of Ms. Jones, in the spirit of continuing the good labor relations relationship, and without [Land and Real-estate] management acknowledging any wrongful conduct, have agreed to resolve these grievances in the following manner . . .
>
> **The parties agree that this agreement satisfies all claims of the grievances GMS2020-464 and GMS2020-465 raised by the Union on behalf of Ms. Catherine Jones**' ID#007741 and does not set any precedent for any other grievance for any other employee.

Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4.  Based on the plain language of the settlement agreement, it is clear to the Court that the parties executed the agreement to "address the issues raised in the Local 2 grievances," and "[t]he parties agree[d] that [the] agreement satisfie[d] all claims of the grievances GMS2020-464 and GMS 2020-465 raised by the Union on behalf of [the plaintiff.]" Id.  Accordingly, the plaintiff, through the settlement agreement, released "all claims" arising from the relevant grievances—i.e., all claims relating to the alleged (1) unsatisfactory performance evaluations and (2) bullying by the plaintiff's manager.  Id.; see also Parvizian, 944 F. Supp. at 3 ("Under District of Columbia law, if the language of a release is not ambiguous on its face, the Court 'must rely solely upon its language as providing the best objective manifestation of the parties' intent.'" (alteration in original) (quoting Bolling, 475 A.2d at 385)).  Stated another way, the "plaintiff has waived [her] right to bring" any claims arising from the relevant grievances "by signing [the] release."  Keister, 410 F. Supp. 3d at 250; see Sanders, 819 F.2d at 1157–58  (holding that where "the [plaintiffs] pursued their grievance remedies and [ ] received relief[,]" those "plaintiffs [were] estopped from litigation by the doctrines of claim preclusion (res judicata) and issue preclusion (collateral estoppel) because the issue of negligent termination was either raised or should been raised in the grievance process, and therefore [could not] be pressed again"); cf. Chester, 335 F. Supp. 2d at 62 ("As the D.C. Circuit declared in

9

Sanders, settlement agreements . . . 'support preclusion' of additional claims by parties to the settlement.").

As described in the Factual Background of this Memorandum Opinion, see supra Section I.A, the plaintiff's first grievance—namely, the Unsatisfactory Performance Evaluation grievance—alleged that "[f]or the past three consecutive years, Management improperly implemented [her] Performance Plan with no beginning [of] year one on one, mid-year review, or end of year review that resulted in an unsatisfactory performance period," and that the "performance plan's objectives [were] subjective and unattainable with unrealistic timelines [that were] more in line with consultant activities." Def.'s Mot., Ex. 6 (Unsatisfactory Performance Evaluation Grievance) at 1. The plaintiff's second grievance—namely, the Bullying by Manager grievance—alleged that "Mr. Segerlin ha[d] continuously engaged in deliberate negative behavior and bullying of [the plaintiff], in a fashion that resulted in harm to her health, thereby establishing a hostile work environment." Def.'s Mot., Ex. 7 (Bullying by Manager Grievance) at 1. More specifically, the plaintiff alleged a "[p]ersistent [p]attern of [t]hreats and [h]arassment," the "[r]emoval of [c]ore [j]ob [d]uties," "[s]abotaging [w]ork [p]roductivity," "[d]emeaning [c]omments," "[e]xclusion from [e]ssential [m]eetings/[p]rojects," "[e]xcessive [m]onitoring/[r]eprimanding [p]ublicly," and the setting of "[u]nrealistic [s]tandards." Id. at 1–3.

These factual allegations of misconduct are repeated in the plaintiff's Complaint and form the basis for her Title VII claims. See e.g., Compl. ¶ 48 ("Prior to the unsatisfactory performance rating, [the p]laintiff was not given a mid-year review, verbal or written counseling, or meetings to discuss any perceived problems with her alleged performance issues."); Compl. ¶ 101 ("[The d]efendant's [ ] unlawful adverse actions materially affected the terms, privileges and conditions of [the p]laintiff's employment when: management subjected her to unnecessary

10

supervisory scrutiny of her attendance, verbal harassment and derogatory comments, undermined [the plaintiff] of her role by refusing to recognize her leadership role, removed significant job responsibilities, [ ] gave her unfair performance evaluations, and subjected her to unfair discipline."); Compl. ¶ 122 ("[The d]efendant subjected [the p]laintiff to the aforementioned adverse employment actions because of her participation and opposition to unlawful and discriminatory employment practices in violation of Title VII, Section 1983."). [4]

Indeed, as the defendant notes, see Def.'s Reply at 4–5, a cursory examination of the relevant grievances and the Complaint demonstrates their likeness. Compare Def.'s Mot., Ex. 6 (Unsatisfactory Performance Evaluation Grievance) at 1 ("The performance plan's objectives are subjective and unattainable with unrealistic timelines and more in line with consultant activities."), with Compl. ¶ 49 ("In March 2019, [the p]laintiff received her mid-year Performance Plan. In it, her job function changed dramatically, her regular workload increased, and unrealistic deadlines were put in place for the next six months. [The p]laintiff was tasked with an assignment that [] included [] significant work that was typically performed by paid consultants."); compare Def.'s Mot., Ex. 7 (Bullying by Manager Grievance) at 1 ("Mr. Segerlin has threatened [the plaintiff] to find another job."), with Compl. ¶ 59 ("On September 16, 2019, [the p]laintiff had a '1:1' conversation with Mr. Segerlin, where Mr. Segerlin suggested to the [p]laintiff that she should start looking for a new job prior to her next performance evaluation on September 29, 2019."); compare Def.'s Mot., Ex. 7 (Bullying by Manager Grievance) at 2 ("On

---

[4] The plaintiff's retaliation claim appears to stem from a grievance she filed in 2019—in other words, her retaliation claim is not based on her filing the two 2020 grievances. See Def.'s Facts ¶ 22 ("In or around December of 2019, [the p]laintiff sent a letter to WMATA's Office of Employee Relations claiming she was being retaliated against for filing a grievance."); Pl.'s Facts ¶ 22. Nonetheless, the plaintiff claims that the alleged adverse actions set forth in her Complaint—i.e., the unsatisfactory performance evaluations and bullying by the plaintiff's manager—were the retaliatory actions taken "because of her participation and opposition to unlawful and discriminatory employment practices in violation of Title VII, Section 1983." Compl. ¶ 122. In other words, the factual allegations of misconduct set forth in her 2020 union grievances form the basis of the alleged retaliation stated in her Complaint.

one occasion, Mr. Segerlin's response to [the plaintiff's] request was 'I am the Task Master and you are the Doer.'"), with Compl. ¶ 53 ("In a conversation [the p]laintiff had with Mr. Segerlin about her job responsibilities in August 2019, Mr. Segerlin told the [p]laintiff that he was the 'Task Master' and that she was the 'doer,' which [the p]laintiff took as a racist reference.").

As discussed in note 2, supra, the plaintiff did not address the impact of the settlement agreement on the present suit in her opposition to the defendant's motion for summary judgment. See generally Pl.'s Opp'n. However, even if the plaintiff had attempted to argue that her union grievances somehow differed from the claims raised in her Complaint, that argument would be unavailing. As should be clear from the preceding analysis, the plaintiff's claims in the grievances center on the creation of a hostile work environment, disparate treatment, and retaliation—i.e., the very counts raised in her Complaint. Compare Compl. ¶¶ 85–133 (asserting claims of hostile work environment and discrimination on the basis of race, and retaliation in violation of Title VII), with Def.'s Mot., Ex. 7 (Bullying by Manager Grievance) at 1 ("Mr. Segerlin has continuously engaged in deliberate negative behavior and bullying of [the plaintiff], in a fashion that resulted in harm to her health, thereby establishing a hostile work environment. . . [;] Mr. Segerlin's bullying behavior follows a pattern of unwarranted negative performance evaluations that are consistently late. Specific patterns of retaliation and harassment surrounding [the plaintiff's] work performance are pretextual[.]" (emphases added)).

Furthermore, the plaintiff sought comparable relief in her grievances as she did in her Complaint. Specifically, her first grievance sought "an eligible step increase and retro[active] pay from her anniversary date." Def.'s Mot., Ex. 6 (Unsatisfactory Performance Evaluation Grievance) at 1. Her Complaint similarly sought "[d]amages and equitable relief for all harm [the p]laintiff has sustained as a result of [the d]efendant's unlawful conduct including for loss of

12

promotional potential, reputation, lost wages, [and] lost job benefits she would have received but for [the d]efendant's unlawful conduct." Compl. at 19. Her second grievance sought "dismissal of Mr. [ ] Segerlin from [her] chain of command," and "compensat[ion] in the amount of $35,000 for pain and suffering since Mr. Segerlin's appointment to the Office of [Land and Realestate] in 2018." Def.'s Mot., Ex. 7 (Bullying by Manager Grievance) at 3–4. Similarly, the plaintiff's Complaint requested "compensatory damages in a fair and just amount," "any medical costs and expenses incurred as a result of [the d]efendant's unlawful conduct," and "equitable relief[,]" which includes "[s]upervisory training for the supervisors at issue[.]" Compl. at 19–20. Accordingly, "[w]ith respect to all of plaintiff's [Title VII] claims (Counts I, II, and III), the doctrine of res judicata bars plaintiff[']s claims because the allegations were already raised and settled within the binding CBA grievance process and cannot be pressed again." Chester, 335 F. Supp. 2d at 62.

Finally, the Court's conclusion is confirmed by the language of the parties' settlement agreement. Specifically, the settlement agreement expressly states that it "satisfies all claims" of the relevant grievances, Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4, which "is unambiguous and constitutes a general release that should not be construed narrowly," Keister, 410 F. Supp. 3d at 252. Indeed, even if the settlement agreement "is silent with respect to certain matters in dispute at the time the release was executed [i.e., the pending Title VII claims before the Court,]" that "does not mean that [the] obligations and documents not expressly mentioned or integrated were not released." Id. (quoting Parvizian, 944 F. Supp. at 4); see also id. (holding that the plaintiff waived certain claims, even where the release did not explicitly mention those claims, because "the entire point of a general release is to allow the parties to preclude all future litigation of claims between them without having to identify each and every claim that might exist");

13

Mwabira-Simera, 2005 WL 1541041, at *2 (D.D.C. June 30, 2005) ("[T]he law is clear that a broad and unambiguous release need not list every conceivable cause of action that might come within its terms." (citing Smith v. Amedisys, Inc., 298 F.3d 434, 443 (5th Cir. 2002), for the proposition that "[t]here is no obligation . . . under Title VII or federal common law, that a release must specify Title VII or federal causes of action to constitute a valid release of a Title VII claim")); Smith, 298 F.3d at 443 ("There is no obligation . . . under Title VII or federal common law, that a release must specify Title VII or federal causes of action to constitute a valid release of a Title VII claim.").

Accordingly, the Court concludes that the Title VII claims raised in the plaintiff's Complaint arise from the relevant grievances—i.e., the alleged unsatisfactory performance evaluations and bullying by the plaintiff's manager—and are therefore barred by the settlement agreement. See Sanders, 819 F.2d at 1157–58 (holding that where "the [plaintiffs] pursued their grievance remedies and [ ] received relief[,]" those "plaintiffs [were] estopped from litigation by the doctrines of claim preclusion (res judicata) and issue preclusion (collateral estoppel) because the issue of negligent termination was either raised or should been raised in the grievance process, and therefore [could not] be pressed again"). More specifically, the settlement agreement satisfied "all claims" arising from the relevant grievances, and therefore precludes the claims raised in the instant suit. Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4; see Mwabira-Simera v. Sodexho Marriot Mgmt. Servs., No. 04-cv-0538 (JDB), 2005 WL 1541041, at *2 (holding that because "[the plaintiff] signed the settlement agreement [and] was reinstated to [her] job as a result of the agreement[,]" the plaintiff had to now "honor the remaining terms of the agreement"). Thus, the Court must grant the defendant's motion and dismiss the plaintiff's Title VII claims.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendant's motion for summary judgment.

**SO ORDERED** this 11th day of October, 2023.[5]

REGGIE B. WALTON<br>
United States District Judge

---

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.